Rule 23 order filed
January 22, 2010;
Motion to publish granted
February 17, 2010, corrected
March 4, 2010.

NO. 5-08-0185

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| RICHARD D. FORD, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellant, | ) Madison County. |
| | ) |
| v. | ) No. 04-L-329 |
| | ) |
| TERRY GRIZZLE, | ) Honorable |
| | ) A. A. Matoesian, |
| Defendant-Appellee. | ) Judge, presiding. |

_____

JUSTICE WELCH delivered the opinion of the court:

The plaintiff, Richard D. Ford, appeals from an order of the circuit court of Madison County entering a judgment for the defendant, Terry Grizzle, pursuant to a jury verdict. On appeal, the plaintiff raises numerous issues, which we restate as follows: (1) whether the trial court erred in denying the plaintiff's motion *in limine* concerning prior accidents and injuries, (2) whether the trial court erred in denying the plaintiff's motion *in limine* concerning the amount of damage to the plaintiff's vehicle, photographs of the plaintiff's vehicle, and any argument regarding minimal impact, (3) whether the trial court erred in allowing statements regarding settlement to be heard by the jury, and (4) whether the trial court erred in denying the plaintiff's motion for a new trial, directed verdict, or judgment notwithstanding the verdict (*n.o.v.*). For the following reasons, we affirm the judgment entered by the circuit court.

On April 12, 2004, the plaintiff filed a complaint in the circuit court of Madison County, alleging that the defendant was negligent when he rear-ended the plaintiff, thereby causing injury to the plaintiff's neck. The defendant admitted that he was negligent in the

1

operation of his motor vehicle, but he denied that the plaintiff was injured to the extent claimed. Beginning on October 9, 2007, a three-day jury trial ensued, in which the following evidence was adduced.

On July 12, 2002, at approximately 4:15 p.m., the plaintiff's vehicle, while stopped northbound on Main Street in Edwardsville, Illinois, was struck from behind by the defendant's vehicle. The plaintiff's vehicle was a truck with a hitch on the back. The plaintiff testified that he was stopped for traffic and noticed that the defendant's vehicle behind him was not stopping. As a result, the plaintiff let up on his brakes and ducked down in anticipation of the impact. The plaintiff estimated that the defendant was traveling between 20 and 25 miles per hour at the time of the collision. The plaintiff testified that his vehicle only moved forward about a foot as a result of the impact.

The defendant testified that at the time of the accident, he was traveling northbound on Main Street behind the plaintiff. The defendant was distracted while driving and was not looking at the road, and when the defendant finally looked up, he saw the plaintiff's vehicle stopped in front of him. The defendant stated that he did not have time to apply his brakes once he looked up and saw the plaintiff's vehicle. The defendant estimated that he was traveling between 15 and 20 miles per hour at the time of the collision.

Immediately after the accident, both the plaintiff and the defendant looked over the vehicles for damage. The damage to the defendant's vehicle was located on the front grill, headlights, bumper, radiator, and fan blade. The defendant testified that his vehicle had some minor preexisting damage before the accident. The plaintiff's vehicle showed no visible signs of damage from the accident. The plaintiff testified that he had the wind knocked out of him and that he felt sore after the collision. However, the defendant testified that the plaintiff did not complain to him at the scene of the accident about any physical pain the plaintiff might have been experiencing. The plaintiff did not go to an emergency room as

2

a result of the accident.

The plaintiff testified that he had visited his chiropractor, Dr. Brian Walsh, earlier on the day of the accident. The plaintiff had been seeing Dr. Walsh and other medical professionals for treatment for injuries resulting from two earlier motor vehicle accidents, one occurring in December 2000 and another occurring on June 8, 2002, just more than one month before the July 2002 accident at issue on appeal.

In the December 2000 accident, the most significant of the three collisions, the vehicle the plaintiff was traveling in was "t-boned" by another vehicle traveling approximately 35 miles per hour. The plaintiff's vehicle was pushed 35 to 40 feet as a result. The plaintiff stated that he had constant, sharp, stabbing pain from the accident, including pain radiating down both arms and his back, significant neck pain, and pain in his ranges of motion. The plaintiff's pain affected his sleep habits and daily activities. After the accident, the plaintiff was treated by a doctor, visited a neurosurgeon, went to a pain management clinic, received injections and a nerve-block shot in his neck, and participated in physical therapy. In January 2001, the plaintiff had an MRI scan that showed degenerative disc disease with a herniated disc in his neck at the C5-C6 level. Approximately seven months following the December 2000 accident, the plaintiff was still experiencing pain from the accident. Therefore, in July 2001, the plaintiff visited Dr. Walsh for treatment, complaining of a bulging disc in his neck at the C5-C6 level.

The plaintiff's treatment with Dr. Walsh for the December 2000 accident lasted through November 2001, when the plaintiff moved to Florida to look for work. The plaintiff testified that at that point he still had neck pain. Dr. Walsh testified that the plaintiff's condition had improved, but he anticipated that the plaintiff would continue to have chronic discomfort in his neck in the future. Upon returning to Illinois from Florida in early 2002, the plaintiff was still experiencing back and neck discomfort, so he resumed his treatment

3

with Dr. Walsh. The plaintiff was treated by Dr. Walsh approximately 10 times each month in April, May, and June of 2002, and he was still receiving treatment when he was involved in the second motor vehicle accident on June 8, 2002.

Although the June 2002 accident was less severe than the December 2000 accident, the plaintiff testified that he reinjured his neck in the June 2002 accident. In the June 2002 accident, the plaintiff's vehicle was rear-ended from behind by another vehicle traveling at approximately 25 miles per hour. The plaintiff braced for the accident and hit his head on the headrest. As a result of the accident, the plaintiff complained of neck and back pain, pain radiating down his arms and midback, headaches, and pain in his eyes. X rays performed by Dr. Walsh indicated that the June 2002 accident had aggravated the plaintiff's injury in his neck at the C5-C6 level. Dr. Walsh testified that this accident aggravated the plaintiff's injuries caused by the December 2000 accident and that this injury could cause the plaintiff pain in the future. The plaintiff was still receiving treatment from Dr. Walsh for these injuries when the accident at issue occurred on July 12, 2002. Dr. Walsh testified that the plaintiff had visited him on the morning before the accident on July 12, 2002, and that the plaintiff had started rehabilitation and was feeling minimal pain on the day of the July 2002 accident.

After the accident on July 12, 2002, the plaintiff again visited Dr. Walsh for a second time that day. The plaintiff complained of neck and back pain, headaches, and pain radiating down his left arm. Dr. Walsh testified at the trial that he believed that the accident caused an exacerbation of the plaintiff's prior condition. Dr. Walsh continued treating the plaintiff after the July 2002 accident, along with referring him to a doctor for nerve-block shots. Dr. Walsh testified that at some point prior to August 2003, the plaintiff's neck was back to the condition it was in before the July 2002 accident.

Dr. Walsh saw the plaintiff multiple times monthly until August 2003, when the

4

plaintiff again moved to Florida to find work and attend school. Upon moving to Florida, the plaintiff began treatment with another chiropractor, Dr. David Spargo, in May 2003 until September 2004. The plaintiff informed Dr. Spargo that his symptoms appeared after he was involved in an automobile accident in July 2002. The plaintiff did not initially tell Dr. Spargo of the two earlier accidents he had been involved in. Dr. Spargo treated the plaintiff for pain in his neck, shoulders, ribs, arms, hands, and back. The plaintiff also complained of pain when lifting heavy objects. Dr. Spargo diagnosed the plaintiff with neck and upper back strain, along with a herniated disc at the C5-C6 level, and advised the plaintiff to refrain from lifting heavy objects. In July 2003, the plaintiff had an MRI scan, which confirmed the disc herniation and muscle strain. In September 2003, Dr. Spargo referred the plaintiff to a neurologist, who diagnosed the plaintiff with a herniated disc at the C5-C6 level with nerve irritation.

At the trial, when asked to compare the plaintiff's MRI in 2001 with the plaintiff's MRI in 2003, Dr. Spargo stated that they were similar but that the herniation in 2001 appeared minimal compared with the herniation depicted in 2003. Dr. Spargo testified that if the plaintiff had a chronic condition prior to the July 2002 accident, the subsequent accident could have aggravated the preexisting injury. Further, although Dr. Spargo testified that the plaintiff's injuries were causally related to the July 2002 accident, he also opined that the plaintiff's two earlier accidents could have been significant to the plaintiff's injury if the plaintiff had not fully recovered from the injuries caused by those prior accidents before the July 2002 accident. Dr. Spargo was unable to determine what percentage of his treatment with the plaintiff was for the July 2002 accident versus the accidents in December 2000 and June 2002.

The plaintiff testified that although he did not initially inform Dr. Spargo of the earlier accidents, his treatment with Dr. Spargo was related to all three accidents, not just the July

5

2002 accident. Further, the plaintiff testified that parts of the medical bills from Dr. Spargo and Dr. Walsh that he submitted to the jury were not solely related to the July 2002 accident but were also related to the two earlier accidents.

In October 2003, the plaintiff visited Dr. John Jenkins, a neurosurgeon. The plaintiff complained of pain in his neck and left arm and hand, along with headaches. Dr. Jenkins diagnosed the plaintiff with a disc herniation at the C5-C6 level with radiculopathy. Dr. Jenkins testified that since other conservative measures had failed to provide the plaintiff relief in the past, the plaintiff was a surgical candidate.

At the trial, Dr. Jenkins opined that the need for surgery was causally linked to the July 2002 accident, but he also testified that during his treatment of the plaintiff, he was not aware that the plaintiff had been involved in the two earlier accidents or had prior chronic pain. Dr. Jenkins testified that if the plaintiff was experiencing pain from earlier motor vehicle accidents prior to the July 2002 accident, the July 2002 accident would only be an aggravation of the underlying condition and the plaintiff might have been a surgical candidate even before the July 2002 accident. Dr. Jenkins explained that if there were no changes in the MRI scans before and after the July 2002 accident, he would expect the exacerbation to only be temporary. Further, after reviewing MRI scans of the plaintiff taken in both 2001 and 2004, Dr. Jenkins testified that the reports were essentially the same. Finally, Dr. Jenkins also testified that the damage to the vehicles involved in the July 2002 accident would be relevant in evaluating the plaintiff's injuries, because a person would be more likely to suffer a disc herniation from a high-speed accident than a low-speed accident.

The plaintiff had cervical fusion surgery in Florida in July 2004 to relieve the problems in his neck. After the surgery, the plaintiff's pain rapidly declined. The plaintiff testified that he no longer has pain in his arms but that he still has minimal pain in his neck and back. Both Dr. Jenkins and Dr. Spargo testified that the plaintiff's prognosis after the

6

surgery was very good, with only limited work restrictions, but that the plaintiff could experience some minor problems or exacerbations in the future.

The plaintiff returned to Illinois and resumed treatment with Dr. Walsh in September 2004 for therapy and adjustments to his middle back. Dr. Walsh testified that he released the plaintiff from treatment for the July 2002 accident in January 2005 and has only seen the plaintiff periodically since then. Further, Dr. Walsh stated that the plaintiff should not return to heavy labor jobs and will likely need to continue chiropractic treatment for the remainder of his life. However, in his treatment of the plaintiff, Dr. Walsh never put any work or physical constrictions on the plaintiff.

In May 2006, the plaintiff was evaluated by the defendant's expert, Dr. Karen Pentella, a board-certified neurologist and pain medicine specialist. In her evaluation, Dr. Pentella reviewed the plaintiff's medical records, conducted an independent medical examination of the plaintiff, and reviewed photographs of the vehicles after the collision. Dr. Pentella testified that photographs of the vehicles were relevant because the photo of the plaintiff's vehicle showed no damage and that the general rule in automobile collisions is that the severity of the impact corresponds to the impact on the vehicle's occupants. Dr. Pentella also reviewed the MRI films from both 2001 and 2003 and testified that she did not see any significant difference between them.

Dr. Pentella stated that the plaintiff's medical records clearly showed that he had chronic neck problems years before the July 2002 accident. Dr. Pentella opined that based upon the abnormality and symptoms dating back to 2001, the July 2002 accident did not cause the C5-C6 herniation for which the plaintiff had surgery. She did not believe that the plaintiff was even a surgical candidate at the time of surgery because the disc was asymptomatic and there was no evidence of nerve irritation. Further, based on her evaluation of the MRIs, she did not believe that the July 2002 accident aggravated the plaintiff's

preexisting condition or significantly increased his pain level. Finally, Dr. Pentella testified that she did not believe that the plaintiff suffered any functional disability as a result of the July 2002 accident.

In August 2005, the plaintiff was evaluated by the plaintiff's expert, Dr. Robert Margolis, a neurologist. After reviewing the plaintiff's medical records and conducting a medical examination of the plaintiff, Dr. Margolis opined that the 2003 MRI revealed further progression of the disc protrusion at the C5-C6 level, that the July 2002 accident was a direct cause of the exacerbation of the plaintiff's injury, and that the need for surgery was a result of the July 2002 accident. However, on cross-examination, Dr. Margolis acknowledged that the plaintiff had a chronic condition in his neck in 2001. Dr. Margolis opined that if a patient with that condition gets rear-ended and suffers whiplash, it could exacerbate the preexisting herniated disc. Further, Dr. Margolis testified that after comparing the 2001 MRI with the 2003 MRI, the plaintiff's C5-C6 disc was in essentially the same condition. Also, Dr. Margolis compared the 2001 MRI with one conducted on the plaintiff in 2004, and he found no change in the plaintiff's condition, which could indicate that the July 2002 accident had no effect on the plaintiff's neck. However, Dr. Margolis indicated that it is also important to evaluate the plaintiff's symptoms, along with the MRI scans.

The jury returned a verdict in favor of the defendant. On October 24, 2007, the plaintiff filed a posttrial motion for a directed verdict or a judgment *n.o.v.* or, in the alternative, a new trial. On April 4, 2008, the circuit court denied the plaintiff's posttrial motion. The plaintiff now appeals.

The plaintiff's first argument on appeal is that the trial court erred in denying the plaintiff's motion *in limine* concerning the plaintiff's prior accidents and injuries. Specifically, the plaintiff asserts that the defendant failed to introduce evidence showing a causal connection between the prior accidents and injuries and the present case. The plaintiff

8

also argues that the introduction of these prior accidents and injuries was highly prejudicial.

We review a trial court's denial of a motion *in limine* under an abuse-of-discretion standard. *Janky v. Perry*, 343 Ill. App. 3d 230, 234 (2003). An appellate court may find an abuse of discretion only where no reasonable person would take the view adopted by the trial court. It is the function of the trial court to determine the admissibility and relevance of evidence, and its ruling will not be disturbed absent an abuse of discretion. *Jackson v. Seib*, 372 Ill. App. 3d 1061, 1070 (2007). Evidence must be relevant to be admissible at a trial. *Voykin v. Estate of DeBoer*, 192 Ill. 2d 49, 57 (2000). Evidence is deemed relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *Fronabarger v. Burns*, 385 Ill. App. 3d 560, 564 (2008).

A prior injury or preexisting condition may be relevant to the issue of a plaintiff's damages in a personal injury action. *Lagestee v. Days Inn Management Co.*, 303 Ill. App. 3d 935, 944 (1999). Evidence of prior injuries may be relevant to negate causation, to negate or reduce damages, or for impeachment. *Voykin*, 192 Ill. 2d at 57. If a defendant wishes to introduce evidence of a prior injury, the defendant must introduce expert evidence demonstrating why the prior injury is relevant to causation, damages, or some other issue of consequence, unless the trial court determines that a layperson can readily appraise the relationship between those injuries. *Voykin*, 192 Ill. 2d at 59.

Before evidence of prior injuries may be admitted at a trial, the defendant must first present medical or other competent evidence to establish a causal connection between the evidence offered and the complained-of injury. *Lagestee*, 303 Ill. App. 3d at 944, 946-47. For a prior injury to be relevant to causation, the injury must make it less likely that the defendant's actions caused any of the plaintiff's injuries or an identifiable portion thereof. *Voykin*, 192 Ill. 2d at 58. Further, even if the prior injury does not negate causation, it could

9

still be relevant to the issue of damages if it could establish that the plaintiff had a preexisting condition for which the defendant is not liable, thus reducing damages. *Voykin*, 192 Ill. 2d at 58. Finally, prior injuries can be relevant to impeachment in that a plaintiff may be examined with respect to his failure to disclose to his physician that he had previously suffered an injury to the same part of the body. *Voykin*, 192 Ill. 2d at 58.

In this case, we cannot say that the trial court abused its discretion by admitting evidence of the plaintiff's prior accidents and injuries. At the trial, Dr. Walsh, Dr. Spargo, Dr. Jenkins, Dr. Pentella, and Dr. Margolis all testified to some degree that the prior injuries were relevant to the current injuries and that the plaintiff had suffered from a preexisting chronic pain-causing condition in his neck prior to the July 2002 accident. Further, the plaintiff was still being treated for his earlier accidents on the day of the July 2002 accident. The plaintiff testified that some of his treatment after the July 2002 accident was also related to the two earlier accidents, that some of the medical bills which he submitted to the jury were not solely related to the July 2002 accident, and that he had failed to inform some of his doctors of earlier accidents when he sought treatment for the July 2002 accident. Thus, we find that the trial court did not abuse its discretion in allowing evidence of the plaintiff's prior accidents and injuries.

The plaintiff's second argument on appeal is that the trial court erred in denying the plaintiff's motion *in limine* concerning the amount of damage to the plaintiff's vehicle, photographs of the plaintiff's vehicle, and any argument regarding minimal impact. Specifically, the plaintiff argues that introducing the photos of the plaintiff's vehicle was highly prejudicial and that no expert testified about the photos or the impact of the vehicle.

We review a trial court's denial of a motion *in limine* under an abuse-of-discretion standard. *Baraniak v. Kurby*, 371 Ill. App. 3d 310, 317 (2007). Recently, this court has had two opportunities to rule on the admissibility of automobile accident photographs in

10

negligence cases, first in the case of *Jackson v. Seib*, 372 Ill. App. 3d 1061 (2007), and most recently in *Fronabarger v. Burns*, 385 Ill. App. 3d 560 (2008). Initially, we recognize that it is the function of the trial court to determine the admissibility and relevance of evidence, and its ruling will not be disturbed absent an abuse of discretion. *Jackson*, 372 Ill. App. 3d at 1070. An abuse of discretion occurs when no reasonable person would take the position adopted by the trial court. *Fronabarger*, 385 Ill. App. 3d at 564.

Evidence is deemed relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *Fronabarger*, 385 Ill. App. 3d at 564. The plaintiff argues that absent expert testimony on the correlation between vehicular damage and the plaintiff's injuries, photographs of the parties' damaged vehicles are inadmissible at the trial; the plaintiff cites *Baraniak v. Kurby*, 371 Ill. App. 3d 310 (2007), *Ferro v. Griffiths*, 361 Ill. App. 3d 738 (2005), and *DiCosola v. Bowman*, 342 Ill. App. 3d 530 (2003). We have declined to accept a rigid rule that photographs are always admissible or that expert testimony is always necessary for those photographs to be admissible. *Fronabarger*, 385 Ill. App. 3d at 564. The critical question in admitting those photographs into evidence is whether the jury can properly relate the vehicular damage depicted in the photos to the injury without the aid of an expert. *Jackson*, 372 Ill. App. 3d at 1070. This question is an evidentiary question left to the discretion of the trial court. *Fronabarger*, 385 Ill. App. 3d at 565.

In this case, we cannot say that the trial court abused its discretion by admitting the photographs without expert testimony. Upon a review of the photographs and the record of the proceedings, we find that a jury could assess the relationship between the damage to the vehicles and the plaintiff's injuries without the aid of an expert. The photographs depicted some damage to the defendant's vehicle and no damage to the plaintiff's vehicle. The

11

photographs were introduced to show why minimal damage to the vehicles was relevant to the nature and extent of the plaintiff's injuries, as stated by both Dr. Pentella and Dr. Jenkins at the trial. The trial court could have properly found that the photographs were relevant to prove that the plaintiff's injury was more or less probable. Therefore, the trial court did not abuse its discretion.

Further, the plaintiff asserts that Dr. Pentella's testimony regarding minimal impact should have been excluded as highly prejudicial. The plaintiff argues that Dr. Pentella gave contradicting testimony and that she did not analyze the impact on the defendant's vehicle as a result of the collision. The plaintiff argues that, therefore, the defendant did not lay a proper foundation to admit Dr. Pentella's testimony.

The decision whether to admit expert testimony is within the sound discretion of the trial court, and a ruling will not be reversed absent an abuse of discretion. *Fronabarger*, 385 Ill. App. 3d at 565-66. An expert's opinion is admissible if the expert is qualified by knowledge, skill, experience, training, or education in a reliable field and if the testimony would aid the jury in understanding the evidence. *Fronabarger*, 385 Ill. App. 3d at 565. The admission of expert testimony requires the proponent to lay an adequate foundation establishing that the information on which the expert bases her opinion is reliable. *Fronabarger*, 385 Ill. App. 3d at 565. Once a proper foundation has been laid, the expert's testimony is admissible, but the weight to be assigned to that testimony is for the jury to decide. *Fronabarger*, 385 Ill. App. 3d at 565.

Just as in *Fronabarger*, we find that the defendant laid a proper foundation for Dr. Pentella's expert testimony. Dr. Pentella testified regarding her qualifications at the trial, including her education, observations, and experiences as a physician. See *Fronabarger*, 385 Ill. App. 3d at 566. Dr. Pentella based her opinions regarding the plaintiff's injuries on her physical examination of the plaintiff, her review of the plaintiff's medical records, and the

12

lack of damage to the plaintiff's vehicle, as depicted in the photographs. Therefore, we find that the trial court did not abuse its discretion in allowing Dr. Pentella's testimony.

The plaintiff's next argument on appeal is that the trial court erred in allowing statements regarding settlement to be heard by the jury. Specifically, the plaintiff points to the defendant's closing argument where the defendant stated that when the lawsuit was filed, the plaintiff requested compensation for all the medical bills from all three accidents, whereas during the trial, the plaintiff asked the jury to only reimburse for those bills related to the July 2002 accident. The plaintiff objected to those statements, which the trial court overruled. The plaintiff contends that those statements implied settlement talks and should not have been admitted to the jury. Alternatively, the plaintiff argues that the statements implied that the defendant would have to personally pay any judgment rendered for the plaintiff. The defendant asserts that the statements were made in response to the plaintiff's suggestion that his medical bills submitted to the jury should be reduced and that the plaintiff's interpretation of these statements is a mischaracterization of the evidence. We agree.

The prejudicial impact of remarks made in opening statements or closing arguments is a matter left within the discretion of the trial court, and the court's ruling will not be overturned on review absent an abuse of discretion. *Morgan v. Richardson*, 343 Ill. App. 3d 733, 740 (2003). In Illinois, statements regarding settlement negotiations or offers to settle are generally not admissible. *Morgan*, 343 Ill. App. 3d at 740. However, in this case, the defendant's statements during closing argument cannot be construed to imply prior settlement offers or negotiations, nor did the defendant make any statements implying that the defendant would have to personally pay any judgment entered for the plaintiff. Instead, those statements were utilized by the defendant for impeachment purposes.

Further, even if the defendant's statements could have been construed by the jury as

13

implying settlement discussions or that the defendant would personally have to pay, if the error did not affect the outcome at the trial or if the appellate court can see from the entire record that no injury has occurred as a result of the remarks, the appellate court will not disturb the judgment on review. *Morgan*, 343 Ill. App. 3d at 740. Thus, we cannot find that the trial court abused its discretion in allowing the defendant's statements during closing argument.

The plaintiff's final arguments on appeal can be combined into one argument that the circuit court erred in denying the plaintiff's requests for a directed verdict, a judgment *n.o.v.*, or a new trial. Established standards are used in determining whether a directed verdict, a judgment *n.o.v.*, or a new trial should be granted. *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992). In considering such motions, the trial court cannot reweigh the evidence and set aside a verdict just because the jury could have drawn different inferences or conclusions or because the court feels that other results are more reasonable. *Maple*, 151 Ill. 2d at 452. Likewise, we cannot unsurp the function of the jury and substitute our own judgment for that of the jury. *Maple*, 151 Ill. 2d at 452-53.

We review *de novo* a trial court's denial of a motion for a directed verdict or a judgment *n.o.v. Jackson*, 372 Ill. App. 3d at 1068. A directed verdict or a judgment *n.o.v.* is properly entered where all the evidence, when viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the moving party that no contrary verdict based on that evidence could ever stand. *Maple*, 151 Ill. 2d at 453. In ruling on a motion for a directed verdict or a judgment *n.o.v.*, the court does not weigh the evidence, nor is it concerned with the credibility of the witnesses. *Maple*, 151 Ill. 2d at 453. Instead, the court may only consider the evidence, and any rational inferences therefrom, in the light most favorable to the nonmoving party. *Maple*, 151 Ill. 2d at 453.

Further, a judgment *n.o.v.* may not be granted merely because a verdict is against the

14

manifest weight of the evidence. *Maple*, 151 Ill. 2d at 453. A trial court has no right to enter a judgment *n.o.v.* if there is any evidence demonstrating a substantial factual dispute or where the assessment of the witnesses' credibility or the determination regarding conflicting evidence is decisive to the outcome at the trial. *Maple*, 151 Ill. 2d at 454.

Alternatively, on a motion for a new trial, a court will weigh the evidence and set aside the verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence. *Maple*, 151 Ill. 2d at 454. A verdict is against the manifest weight of the evidence where the opposite result is clearly evident or where the jury's findings are unreasonable, arbitrary, and not based on the evidence. *Maple*, 151 Ill. 2d at 454. We will not reverse a trial court's ruling on a motion for a new trial unless it is affirmatively shown that the court clearly abused its discretion, because the trial judge had the benefit of observing the witnesses firsthand at the trial. *Maple*, 151 Ill. 2d at 455. In determining whether the trial court abused its discretion, we must consider whether the jury's verdict was supported by the evidence and whether the losing party was denied a fair trial. *Maple*, 151 Ill. 2d at 455.

After carefully reviewing the evidence adduced at the trial, as set forth above, we cannot find that the jury's findings were unreasonable, arbitrary, and not based upon the evidence. The jury in this case heard conflicting testimony regarding what, if any, injuries the plaintiff sustained as a result of the accident in question. The credibility issues at the trial were especially significant in light of the subjective nature of the plaintiff's complaints, the photographic evidence showing minor damage to the plaintiff's vehicle, and Dr. Pentella's findings. See *Jackson*, 372 Ill. App. 3d at 1069. Since the witnesses' testimony in this case conflicted, the question of whom to believe and what weight to give to all the evidence was a decision for the trier of fact, whose determinations should not be upset on review unless manifestly erroneous. See *Jackson*, 372 Ill. App. 3d at 1069. It is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to

decide the weight to be given to the witnesses' testimony. *Maple*, 151 Ill. 2d at 452. For these reasons, we cannot conclude that the trial court erred in denying the plaintiff's requests for a directed verdict, a judgment *n.o.v.*, or a new trial.

For the foregoing reasons, the judgment of the circuit court of Madison County is hereby affirmed.


Affirmed.


SPOMER, J., concurs.


JUSTICE CHAPMAN, dissenting:

I believe that the jury verdict was against the manifest weight of the evidence and that therefore a motion for a new trial should have been granted. See *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992). In this admitted negligence case, a verdict for the plaintiff was clear from the testimony and the medical evidence presented at the trial. From the evidence, I believe that the jury should have concluded that the defendant's negligence, at the very least, proximately caused an aggravation of a preexisting injury. The amount of the verdict was much less evident. Determining the nature and extent of the plaintiff's injuries that were causally related to the accident of July 12, 2002, and not to his two prior automobile accidents, was no easy task. Despite the difficulty of the task before it, the jury had a duty to resolve the issue of proximate cause fairly, applying the facts to the law, and not throw up its hands and award zero damages. For those reasons, I would reverse and remand for a new trial.

NO. 5-08-0185

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | |
|---|---|
| RICHARD D. FORD, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellant, | ) Madison County. |
| | ) |
| v. | ) No. 04-L-329 |
| | ) |
| TERRY GRIZZLE, | ) Honorable |
| | ) A. A. Matoesian, |
| Defendant-Appellee. | ) Judge, presiding. |

**Rule 23 Order Filed:**      January 22, 2010
**Motion to Publish Granted:**      February 17, 2010
**Opinion Filed**:      February 17, 2010

---

**Justices**:      Honorable Thomas M. Welch, J.

                Honorable Stephen L. Spomer, J.,
                Concurs
                Honorable Melissa A. Chapman, J.,
                Dissents

---

**Attorneys**
**for**
**Appellant**
     Lance R. Mallon, Dawna M. Hale, Mallon Law Firm, Ltd., 515 Madison Avenue, Wood River, IL 62095

---

**Attorney**
**for**
**Appellee**
     Michael J. Bedesky, Reed, Armstrong, Gorman, Mudge & Morrissey, P.C., 115 N. Buchanan, P.O. Box 368, Edwardsville, IL 62025